## UNITED STATES DISTRICT COURT FOR

## THE CENTRAL DISTRICT OF CALIFORNIA

WINTER KELLY,                                    Case No.

       Plaintiff,                               COMPLAINT

     against

CEDARS-SINAI HEALTH SYSTEM;
CEDARS-SINAI MEDICAL CENTER; and
DOES 1-10,

       Defendants.

Plaintiff WINTER KELLY, by and through her attorneys, NYE, STIRLING, HALE &

MILLER, LLP, and for her Complaint in this matter against Defendants CEDARS-SINAI

HEALTH SYSTEM and CEDARS-SINAI MEDICAL CENTER, and DOES 1-10, states and

alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.     Plaintiff Winter Kelly has been deaf since the age of 15 and non-verbal since 2013.

Ms. Kelly utilizes ASL interpreters and lip reading to communicate effectively. As such, Plaintiff

is limited in the major life activities of hearing and speaking.

2.     Cedars-Sinai Health System and Cedars-Sinai Medical Center, and Does 1 through

10 (together, the "Defendants") discriminated against Plaintiff by violating the Americans with

Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), Section 1557 of the Affordable Care Act ("ACA"), the Unruh Civil Rights Act ("UCRA"), and the California Disabled Persons Act ("DPA") resulting in significant barriers to access medical services at Defendants' facilities. Specifically, Plaintiff experienced difficulty and risk of harm when she was either turned away from service or otherwise not provided an ASL interpreter, adequate Video Remote Interpreting ("VRI") software, or other effective means to communicate with doctors at Defendants' medical facilities, making it exceedingly difficult, and sometimes impossible, for Plaintiff to access her medical care with Defendants. These violations exist due to a systemic failure to maintain accessibility features at Defendants' facilities identified in this Complaint.

3.      Plaintiff brings this action individually to compel Defendants to cease unlawful discriminatory practices and implement policies and procedures that will ensure Plaintiff full and equal enjoyment, and a meaningful opportunity to participate in and benefit from Defendants' healthcare services. Plaintiff seeks declaratory, injunctive, and equitable relief, statutory damages, and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of Title III of the ADA, 42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act, and Section 1557 of the ACA, The UCRA, CA Civil Code §51 et seq., and the DPA, CA Civil Code §54-54.3.

4.      Plaintiff visited Defendants' facilities in California and was denied full and equal access, and in some instances *any* access, as a result of Defendants' improper policy for persons with disabilities. Defendants denied Plaintiff equal access to its facilities by failing to provide appropriate and reasonable accommodations that would ensure effective communication and access to medical services, as required by the ADA, the Rehabilitation Act, Section 1557 of the ACA, the UCRA, and the DPA.

5.     By failing to make its medical centers accessible to Plaintiff and other hearing-impaired persons, Defendants, public accommodations subject to Title III of the ADA, deprive disabled persons of the full benefits of Defendants' healthcare services—all benefits it affords non-disabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III of the ADA is meant to redress.

6.     Defendants have further demonstrated through its interactions with Plaintiff that Defendants' employees are not trained regarding civil rights, effective communication, hearing accommodations, privacy considerations, or how to interact with hearing-impaired individuals.

7.     Defendants' discrimination sends a message that it is acceptable for medical providers to adopt policies, procedures, and practices that deprive hearing-impaired individuals of the opportunity to be full partners in their receipt of healthcare services — or to even receive healthcare services at all.

8.     The ADA expressly contemplates injunctive relief aimed at modification of a policy or practice that Plaintiff seeks in this action. In relevant part, the ADA states:

> Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods.

42 U.S.C. § 12188(a)(2).

9.     Consistent with 42 U.S.C. § 12188(a)(2), Plaintiff seeks a permanent injunction requiring that:

a.   Defendants take all steps necessary to adopt policies and procedures that bring its facilities into full compliance with the requirements set forth in the ADA and its implementing regulations in order to ensure that disabled person have equal access to healthcare;

b.   Defendants take all steps necessary to ensure that the effective communication barriers at Defendants' facilities do not reoccur; and

c.   Plaintiff's representatives monitor Defendants' facilities to ensure the injunctive relief ordered pursuant to Paragraph 9.a. and 9.b. has been implemented and will remain in place.

d.   Plaintiff's representatives monitor Defendants' facilities for a reasonable period of time in the future as proscribed by this Court to ensure the injunctive relief ordered pursuant to Paragraph 9.a., 9.b., and 9.c. has been implemented and will remain in place.

## **PARTIES**

10.   Plaintiff Winter Kelly is, and at all times relevant hereto was, a resident of Los Angeles County, California. Plaintiff's current residence is located at 9701 Wilshire Boulevard, Beverly Hills, California 90212. Plaintiff is deaf and non-verbal.

11.   Defendants Cedars-Sinai Health System and Cedars-Sinai Medical Center are California non-profit public benefit corporations organized and existing under the laws of California with their headquarters at 8700 Beverly Boulevard, Los Angeles, California 90048. Cedars-Sinai Health System operates other Cedars-Sinai facilities, including but not limited to facilities at: 8767 Wilshire Boulevard, Beverly Hills, California 90211; 8635 W. 3rd Street, Los Angeles, California 90048; 200 N. Robertson Boulevard, Beverly Hills, CA. 90211; and 9025 Wilshire Boulevard, Suite 210, Beverly Hills, California 90211.

12.   Plaintiff received treatment at Defendants' facilities located at 8700 Beverly Boulevard, Los Angeles, California 90048; 8767 Wilshire Boulevard, Beverly Hills, California 90211; 8635 W. 3rd Street, Los Angeles, California 90048; 200 N. Robertson Boulevard, Suite

4

205, Beverly Hills, California 90211; and 9025 Wilshire Boulevard, Suite 210, Beverly Hills, California 90211.

13.     Defendants' facilities are places of public accommodation as defined in 42 U.S.C. §12181(7)(G) and Defendants are subject to the requirements of the ADA, the UCRA, the Rehabilitation Act, and the DPA.

14.     The true names and capacities, whether individual, corporate, associate, or otherwise of the Defendants named herein as Does 1 through 10, are unknown to Plaintiff at this time. Plaintiff will amend this Complaint to allege their true names and capacities when known. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this Complaint.

15.     Plaintiff alleges that Defendants, including Doe Defendants, and each of them at all times mentioned in this Complaint, were the alter egos, agents, employees, and/or employers of their Co-Defendants, and in doing the things alleged in this Complaint were acting within the course of such agency and/or employment and with the permission and consent of their Co-Defendants.

## **FACTUAL BACKGROUND**

### **Plaintiff Has Been Denied Full and Equal Access to Defendants' Facilities**

16.     Plaintiff utilizes auxiliary aids for communication and is proficient in American Sign Language (hereafter, "ASL") and lip-reading. Although Plaintiff can read and write, both can be difficult for her because of a variety of health conditions.

17.     Plaintiff visited Defendants' medical center emergency room located at 8700 Beverly Boulevard, Los Angeles, California 90048 on July 18-19, 2020, and February 26, 2021.

18.     During her visits to Defendants' medical center emergency room to receive medical treatment on July 18-19, 2020, and February 26, 2021, Plaintiff encountered numerous accessibility barriers that made it difficult, if not impossible, to access her medical care. Those barriers include, but are not limited to:

- On July 18, 2020, when Plaintiff arrived at the emergency room entrance, she struggled to get out of her Uber because of the severe pain in her leg for which she was seeking treatment. Plaintiff was greeted by a nurse in a mask who, although congenial at first, became aggressive and angry when Plaintiff failed to explain her reason for coming to the ER or getting out of the car. Plaintiff indicated she was deaf by pointing to her ears, but Defendants' nurse continued to berate Plaintiff for not speaking or getting out of the Uber. The nurse yelled at Plaintiff until Plaintiff's Uber driver stepped in and indicated Plaintiff was deaf. The nurse then turned around and left Plaintiff to struggle into the emergency room on her own. Once inside, Plaintiff was given a wheelchair because she could barely walk. The nurse locked the wheelchair from behind such that Plaintiff was unable to move. Although Plaintiff indicated again that she was deaf, no one made any attempt to accommodate her or provide her any effective means of communication. Periodically, a member of Defendants' staff appeared in the waiting area and appeared to speak. Although the waiting room was empty except for one other individual, it appeared he was calling out a name. However, because he was wearing an opaque mask, Plaintiff could not read his lips to be certain. Plaintiff tried to get his attention to again indicate she could not hear but was ignored. Plaintiff could not move toward the individual because the wheelchair she was

placed in was locked from behind. Plaintiff was eventually wheeled by this same individual into the Emergency Room where she was left, facing a wall. In great pain, and unable to walk or move by herself in the wheelchair, which was again locked from behind, Plaintiff was left in that position. Plaintiff desperately needed to use the restroom but had not way to communicate this to anyone in the hospital. Once Plaintiff was given a bed, she was not provided an American Sign Language (ASL) interpreter despite requesting one hours earlier upon her initial arrival. Her existing medical record from prior visits with Defendants also clearly indicated that she is deaf and needs an ASL interpreter to communicate. In lieu of providing the ASL interpreter Plaintiff requested, hospital staff tried to set up the "My Accessible Real Time Trusted Interpreter" ("MARTTI" – a form of Video Remote Interpreting – "VRI"), but it would not start. To develop some bridge of communication after her long wait, Plaintiff attempted to restart the MARTTI herself as she is familiar with them. The doctor saw Plaintiff troubleshooting the MARTTI, however, and aggressively grabbed it out of Plaintiff's hands, scolded her, and shared an angry exchange with the nurse. For approximately three hours, Plaintiff struggled to communicate with Defendants' staff via pen and paper and was made to feel as though they believed she was "dumb." Defendants' treating physician, Dr. Moye, later took Plaintiff's pen and paper away from her (her only means of communication at this point) after Dr. Moye saw Plaintiff take a photograph of the written exchanges Plaintiff had with the medical staff. Discouraged by the poor treatment she had received and feeling humiliated and shamed by the medical staff because of her disability, Plaintiff requested and received a new medical team to

assist her for the duration of her visit once an ASL interpreter arrived. Notably, the ASL interpreter arrived five hours after she first requested one. The ASL interpreter told her that he was there within thirty minutes of receiving the call for his services.

- Plaintiff visited Defendants' emergency room again on February 26, 2021, for replacement of an IV due to vascular access issues. Plaintiff brought her own ASL interpreter to ensure she received timely access to adequate healthcare in light of her prior experience in Defendants' emergency room. Plaintiff did this at her own expense. Her interpreter was not able to stay for her entire visit, however, and Plaintiff asked the hospital to provide an ASL interpreter, but the hospital offered a MARTTI instead. The MARTTI worked briefly but then failed, as it often does in Plaintiff's experience. Plaintiff declined trying to use another MARTTI and requested an ASL interpreter so she could effectively communicate with the medical staff in a timely manner and without interruption. The hospital denied Plaintiff's request and she was forced to communicate by reading lips (staff were wearing clear masks on this day) and answering yes and no questions by giving a thumbs up or thumbs down to do so.

19.     During her visits to Defendants' internal medicine clinic at 8767 Wilshire Boulevard, Beverly Hills, California 90212, to receive in-person medical treatment on September 4, 2020, September 17, 2020, and May 27, 2021, and virtual appointments on August 17, 2021, August 24, 2021, and August 31, 2021, Plaintiff encountered numerous accessibility barriers, harassment, and discrimination, which made it difficult, if not impossible, to access her medical care. Those barriers include, but are not limited to:

- On September 4, 2020, Plaintiff had a video call appointment with Dr. Scott Ditch At the last minute, Dr. Ditch cancelled the appointment writing, "Unfortunately, our ASL interpretation services are not currently compatible with Epic or Doximity which are the 2 platforms that we use for video visits… There was no solution that I could find." The doctor then suggested she go to urgent care instead and refused to provide her medical services.

- On September 17, 2020, Plaintiff visited Defendants' internal medicine facility for an appointment with Dr. Michelle Neely. Upon arrival, Plaintiff used the restroom because she felt nausea. When she checked in for her appointment, staff told Plaintiff via pen and paper that she did not have an appointment. Plaintiff asked if her interpreter had arrived so she could better communicate but the staff ignored her question. Plaintiff continued to try to explain that she had an appointment and needed an interpreter, but the staff was not responsive to her and continued to repeat that she did not have an appointment via pen and paper. Plaintiff removed her mask briefly to mouth the words, "Can I have your boss," in a futile attempt to try to communicate. The staff at the clinic responded by calling a security guard over who proceeded to scold Plaintiff. When Plaintiff took the guards photograph, he became irate and tried to take her phone from her and then left abruptly. Plaintiff, scared and humiliated by the experience, left the clinic without service. Later calls to both the facility and the agency providing the interpreter revealed that Plaintiff did have an appointment, that the ASL interpreter Plaintiff scheduled at her own expense had arrived, but that facility staff sent the interpreter home while Plaintiff was in

the bathroom. Defendants also stated they called security because Plaintiff was "writing aggressively" and further, that her file was now flagged.

- On May 13, 2021, Plaintiff visited Defendants' internal medicine facility for an appointment with Dr. Matthew Kollefrath. Upon arrival, Plaintiff was told that the interpreter would not be there, despite previous promises. For the entire visit, a security guard from the September 17, 2020 incident "shadowed" Plaintiff making her feel unsafe, nervous, and unwelcome although at the time she assumed that it was coincidental. On May 27, 2021, Plaintiff visited Defendants' internal medicine facility again for another appointment with Dr. Matthew Kollefrath. This time Plaintiff arranged her own interpreter to come with her to act as her ASL interpreter to ensure she received timely access to adequate healthcare in light of her prior experience at this facility. After checking in, the staff at the front desk called for security and told the security guard, "that's her over there," while pointing at Plaintiff. For the remainder of Plaintiff's time in the waiting area, the same security guard from Plaintiff's September 17, 2020, visit stood over Plaintiff. This time, Plaintiff was scared and humiliated by Defendants' actions. When Plaintiff saw Dr. Kollefrath, she complained about the security guard hovering over her and making her feel harassed and threatened. Dr. Kollefrath responded that he, "could not get involved with that."

- Unable to access Plaintiff's internal medicine facilities at 8767 Wilshire Boulevard without the facility's staff harassing her, Plaintiff had no choice but to turn to telemedicine with Dr. Kollefrath. Dr. Kollefrath failed to treat Plaintiff despite having virtual appointments on three separate occasions: August 17, 2021, August

24, 2021, and August 31, 2021. On August 17, 2021, Plaintiff had her office call Dr. Kollefrath's office to ensure an interpreter would be available for her appointment with the doctor. The office said no and stated they would have to reschedule and told Plaintiff they would text her with her appointment information. When Plaintiff received the text and replied to it, she received a message that she needed to call the office instead. She emailed to complain as telephone was not an effective form of communication for the Plaintiff and they assured her they would contact her through email. When Plaintiff received an email indicating the office had arranged an interpreter, she replied and received a message not to reply to email but to call the office. On August 24, 2021, Plaintiff showed up for her appointment virtually, but Dr. Kollefrath failed to show. On August 31, 2021, Plaintiff showed up for her appointment, but Dr. Kollefrath again failed to show. Notably, Dr. Kollefrath stated that he missed the August 31, 2021, appointment because he was on the phone for an hour trying to engage MARTTI interpreter services for Plaintiff's appointment. Neither the Doctor nor anyone from his staff bothered to alert Plaintiff as to the nature of the doctor's failure to show during her scheduled appointment time, however, as she waited for more than an hour. In a later communication, Dr. Kollefrath stated, "…it appears Martti interpreter services may be unreliable (I had issues as a trainee in the hospital with this service as well). … I am determined to make this happen so we can get to improving your health!"

20.    Plaintiff visited Defendants' facility located at 8635 W. 3rd Street, Los Angeles, California 90048, to receive medical treatment from Dr. Nicole Tyer on July 15, 2020, and from Dr. Benjamin Bluen on March 22, 2021. During these visits, Plaintiff encountered numerous

accessibility barriers, harassment, and discrimination that made it impossible to access her medical care. Those barriers include, but are not limited to:

- On July 15, 2020, Plaintiff had a video telehealth appointment with Dr. Nicole Tyer. Defendants' video telehealth service was inaccessible, however, because it did not allow for a third-party interpreter to join the video call. Plaintiff had nevertheless arranged for an interpreter to be with her on her end, at her own expense. At the last minute, however, and while knowing that Plaintiff is deaf, Dr. Tyer changed the appointment from a video call to a phone call. Dr. Tyer then called Plaintiff's place of business to initiate the appointment. Prior to the appointment, Plaintiff painstakingly tried to draft a written explanation of her symptoms, however, Dr. Tyer refused to listen to Plaintiff's co-worker who attempted to read this on her behalf because it was taking too long. Plaintiff was unable to communicate with the doctor as a result. Plaintiff later received an email from Dr. Tyer that failed to address Plaintiff's medical needs.

- On March 3, 2021, Plaintiff's office called Dr. Bluen to schedule an appointment and to request an ASL interpreter for her appointment. Despite her health issue being urgent in nature, she was only able to get an appointment on March 22, 2021. Plaintiff's office confirmed with Dr. Bluen's office that they knew Plaintiff was deaf and in need of an ASL interpreter for this appointment. On March 22, 2021, Plaintiff took an Uber ride to her appointment that cost her approximately $200.00 because she was temporarily unable to live at her home due to a mold issue and had no other way of getting to her appointment. Prior to arriving, Plaintiff called the office four times to ensure that an ASL

interpreter would be available to her when she arrived, however, her office was unable to connect with anyone prior to her arrival. Upon arrival, Plaintiff encountered a locked door at the facility, waited until her appointment time despite being in tremendous pain with nowhere to sit down – something Plaintiff needs to do because of her condition – and then rang the buzzer to enter the building. Instead, one of Defendants' staff members came outside and, without removing her mask so patient could attempt to read her lips (and without any ASL interpreter), began speaking to Plaintiff. Plaintiff pointed to her ears to indicate she could not hear or understand the staff member, but to no avail. The staff member eventually allowed Plaintiff inside and retrieved a pen and paper to ask Plaintiff if she was the interpreter or the patient. When Plaintiff indicated she was the patient, the staff denied her service because there was no ASL interpreter available. Plaintiff begged to be seen by the doctor even without an ASL interpreter present but was denied service and again sent away without seeing Dr. Bluen. Notably, while Plaintiff was begging to see the doctor, a non-deaf patient arrived, checked-in, sat in the waiting room, and was led in to see a doctor within minutes. Plaintiff needed to see Dr. Bluen on March 22, 2021, because she had a time sensitive procedure scheduled the next day and needed Dr. Bluen's input to ensure she could undergo the procedure without issue. Plaintiff had previously seen Dr. Bluen and, although he failed to provide an interpreter on that visit as well, he did see Plaintiff who communicated as best she could by reading his lips and via pen and the paper cover on the treatment table.

13

21.     During her visit to Defendants' orthopedics facility located at 200 North Robertson Boulevard #205, Beverly Hills, California 90211, to receive medical treatment from Dr. David Golden on August 12, 2020, Plaintiff encountered numerous accessibility barriers, harassment, and discrimination that made it impossible to access her medical care. Those barriers include, but are not limited to:

- Plaintiff scheduled an appointment for August 12, 2020 and confirmed with the office an interpreter would be available to her for the appointment. When she arrived, staff told Plaintiff the interpreter had failed to show. Plaintiff waited while the interpreter was contacted and the interpreter confessed to having mixed up the dates. Plaintiff asked to see the doctor without the interpreter as she had recently collapsed, had extreme pain, and had been referred by the emergency department for follow-up treatment. Plaintiff indicated she could read lips if the doctor wore a clear mask as she had seen another staff member in the clinic wearing while she waited. Nevertheless, Defendants denied her and turned her away because "it would be too inconvenient" for the doctor to try to communicate with her without an interpreter present.

22.     On September 15, 2020, Plaintiff made an appointment to see Dr. David Ramin, an internal medicine physician with Cedars-Sinai located at 9025 Wilshire Boulevard, Suite 210, in Beverly Hills, California. Dr. Ramin's office stated they would not provide an interpreter, however Plaintiff arranged to provide her own, at her own expense, as she often does. On the day of the appointment, the interpreter called to confirm the appointment and to remind them she would have an interpreter arriving for the appointment, as well. Rita, a staff member in Dr. Ramin's office, became upset and explained they do not work with interpreters and have the right to refuse service

to anyone. Plaintiff contacted Cedars-Sinai to complain and spoke with Yocelyn. Yocelyn cancelled Plaintiff's appointment with Dr. Ramin and arranged for her to see Dr. Michelle Neely two days later on September 17, 2020, instead.

23.     Plaintiff has also tried and failed on many occasions to get a local primary care physician through Cedars-Sinai Health System so that she can obtain necessary healthcare close to her home. Plaintiff was denied service because she is deaf and accommodations for deaf patients are time consuming and costly.

24.     Plaintiff filed a formal written complaint with Defendants regarding the communication barriers she encountered via fax on September 17, 2021, and via certified mail on September 20, 2021. Unfortunately, Defendants failed to give any indication they intended to update their training and policies so that similar accessibility violations would not occur in the future. Nor did they give any indication they would train the medical staff in the use of the MARTTIs (or other translation services) and abide by its policy to provide ASL interpreters or any other form of effective communication.

25.     As a result of Defendants' failure to ensure hearing accommodations for Plaintiff and denial of equal access and services, Plaintiff received services that were objectively substandard, inaccessible, and inferior to those provided to hearing patients, and was subjected to discriminatory treatment because of her disability - when she was treated at all.

26.     Considering the pain, humiliation, and objectively substandard and inaccessible services provided by Defendant, Plaintiff has taken to traveling to San Diego for treatment with a doctor who does not discriminate against her based on her disability. However, traveling to San Diego for medial service is not a feasible option in the long term. Dr. Whiting encouraged her to find a doctor closer to her residence due to the increasing number of complications with her health.

27.     Therefore, despite the difficulty, frustration, and unequal treatment Plaintiff has received, Plaintiff must seek Defendants' healthcare services in the future due to limited medical care options, the proximity of Defendants' facilities to her home, and because Plaintiff has an extensive medical history with Defendants who can easily access her records for treatment. Specifically, Plaintiff will have to return to Defendants' facilities and anticipates being required to do so to have additional medical care to treat her ongoing medical conditions but is deterred from doing so due to the discrimination she has faced and expects to face in the future. Furthermore, Plaintiff intends to return to Defendants' facilities to ascertain whether those facilities remain in violation of accessibility standards.

## JURISDICTION AND VENUE

28.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

29.     This Court has personal jurisdiction over Defendants because Defendants maintain their headquarters in California, have sufficient minimum contacts with California, or have otherwise purposely availed themselves of the markets in California through the promotion, marketing, and sale of its services in California to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Specifically, Defendants are registered to do, and have been doing, business in California.

30.     Venue is proper under 28 U.S.C. § 1391(a) and (b)(2) because Defendants are subject to personal jurisdiction in this District. Defendants do substantial business in this District, and a substantial part of the events or omissions giving rise to these claims occurred in this District. Defendants engaged in the extensive promotion, marketing, distribution, and sales of the services at issue in this District.

**FIRST CAUSE OF ACTION**

**VIOLATION OF THE ADA, TITLE III**

**[42 U.S.C. §§ 12101 et seq.]**

31.     Plaintiff restates each and every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if more fully set forth herein.

32.     At all times relevant to this action, Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12181, et seq. was in full force and effect and applied to Defendants' conduct.

33.     At all times relevant to this action, the United States Department of Justice regulations implementing Title III of the ADA, 28 C.F.R. Part 36, were in full force and effect and applied to the Defendants' conduct.

34.     Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Pub. L. No. 101-336, § 2(b)(1), 1990 U.S.C.C.A.N. (104 Stat.) 327, 329 (codified at 42 U.S.C. § 12101(b)(1)).

35.     At all times relevant to this action, Plaintiff has been substantially limited in the major life activity of hearing and speaking. Accordingly, she is considered an individual with a disability as defined under the ADA, 42 U.S.C. § 12102(2).

36.     Defendants own, lease, and/or operates a comprehensive system for healthcare services that are places of public accommodation as defined under Title III of the ADA, 42 U.S.C. § 12181(7)(F).

37.     Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodations." 42 U.S.C. § 12182(a).

38.     Pursuant to Title III of the ADA and its implementing regulations, a public accommodation cannot deny participation or offer unequal or separate benefits to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. §§ 36.202.

39.     Pursuant to Title III of the ADA and its implementing regulations it "shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).

40.     Qualified interpreters on-site or through VRI services are auxiliary aids and services under the Title II regulations. 28 C.F.R. § 35.104. VRI is required to be a real-time, full-motion video and audio over a dedicated high-speed video connection that is on a display large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position. 28 C.F.R. § 35.160(d). The staff is required to be adequately trained in this technology. *Id.* Section 36.303 likewise defines "auxiliary aids and services" to include qualified interpreters, VRI services, or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing.

41.     Defendants' facilities, as public accommodations, are required to furnish these appropriate aids and auxiliary services to ensure effective communication with individuals with disabilities, like Plaintiff. 28 C.F.R. § 36.303(c)(1). The public accommodation cannot require the

individual with the disability to bring another individual to interpret for them as the Defendants have frequently required of Plaintiff in order to utilize its services, Id. at subs. (c)(2).

42.     Defendants discriminated against Plaintiff on the basis of her disability by denying her access to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and/or accommodations of its places of public accommodation, and equal opportunity to participate in and benefit from Defendants' healthcare services, in violation of the ADA.

43.     As set forth above, absent injunctive relief, there is a clear risk that Defendants' actions will recur with Plaintiff and/or other hearing-impaired persons seeking Defendants' healthcare services.

44.     Plaintiff is therefore entitled to injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1) and/or common law.

## SECOND CAUSE OF ACTION

### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

45.     Plaintiff incorporates the allegations in the preceding paragraphs, as if alleged herein.

46.     Plaintiff is an individual with a disability protected by Section 504 of the Rehabilitation Act. See 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j).

47.     Defendants are recipients of federal financial assistance from the Department of Health and Human Services and is subject to Section 504 of the Rehabilitation Act and its implementing regulations. See 29 U.S.C. § 794; 45 C.F.R. § 84.3(h).

48.     Section 504 of the Rehabilitation Act provides that no qualified individual with a disability shall be subjected to disability-based discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

49.     Discrimination includes failing to "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or providing qualified handicapped persons with "an aid, benefit, or service that is not as effective as that provided to others."   45 C.F.R. § 84.4(b)(1)(ii)-(iii); see 45 C.F.R. §§ 84.52(a)(2)-(3).

50.     Section 504 requires health programs or activities that receive federal financial assistance and that have at least fifteen employees to provide auxiliary aids and services to individuals who are hearing-disabled and use auxiliary aids. 45 C.F.R. §§ 84.52(b), (d). It further requires that the health programs provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance." 28 C.F.R. § 42.503(f). "Such auxiliary aids may include brailled and taped material, qualified interpreters, readers, and telephonic devices." *Id.*

51.     Section 504 was implemented to "[e]nsure that communications with [Defendants'] applicants, employees and beneficiaries are effectively conveyed to those having impaired vision and hearing." 28 C.F.R. § 42.503(e).

52.     A recipient may not directly or through contractual, licensing, or other arrangements, discriminate on the basis of disability. 45 C.F.R. § 84.4(b)(1).

53.     Defendants' provision of healthcare services constitutes a program or activity receiving federal financial assistance and, as a recipient, it is required to ensure that both Defendants and their contractors comply with Section 504 of the Rehabilitation Act.

54.     Defendants have failed and are failing to meet their obligation to provide hearing-impaired individuals an equal opportunity to use and benefit from its health care programs and

activities. In failing to provide deaf patients an accessible environment for Plaintiff and others similarly situated, Defendants have refused to provide the auxiliary aids and services necessary to provide such patients medical treatment in an equally effective and timely manner that protects their privacy and independence.

55.     Examples of Defendants' inaccessible facilities for hearing-impaired individuals are listed in paragraphs 17-22 above.

56.     Because Plaintiff and other hearing-impaired individuals cannot independently access the medical facility, they must either find and rely on third party assistance, which intrudes upon the privacy of their personal medical and financial information or forego accessing their critical healthcare altogether when Defendants' systemic failures to provide appropriate auxiliary aids and services abound. Defendants' failure to provide equally effective accommodations to hearing-impaired patients puts their health at risk. This is especially pronounced in the failure to have ASL interpreters or adequate VRI equipment to allow Plaintiff and other deaf individuals the ability to effectively communicate with their healthcare providers in a timely manner at every appointment or visit to Defendants' facilities.

57.     As a result of Defendants' actions and omissions, Plaintiff and other hearing-impaired individuals have suffered and will continue to suffer irreparable harm in the form of discrimination and unequal access to Defendants' healthcare services. If there is no change in the status quo, Plaintiff and other hearing-impaired individuals will be denied their right to access and engage fully in the provision of their healthcare.

58.     Defendants' failure to meet its obligations to accommodate hearing-impaired patients in an effective manner constitutes an ongoing and continuous violation of the ADA and the Rehabilitation Act, and their implementing regulations. Unless restrained from doing so,

Defendants will continue to violate the ADA and the Rehabilitation Act. Unless enjoined, Defendants' conduct will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

59.      Defendants' refusal to accommodate hearing-impaired patients in an equally effective manner through the provision of alternative formats was done intentionally or with deliberate indifference to the protected rights of Plaintiff and other hearing-impaired individuals.

60.      Plaintiff is entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

**THIRD CAUSE OF ACTION**

**VIOLATION OF SECTION 1557 OF THE PATIENT PROTECTION AND**

**AFFORDABLE CARE ACT**

**[42 U.S.C. § 18116]**

61.      Plaintiff incorporates the allegations in the preceding paragraphs, as if alleged herein.

62.      Since March 2010, there was in full force and effect a statute known as the Patient Protection and Affordable Care Act (the "Affordable Care Act"), 42 U.S.C. § 18001, *et seq.,* Pub.L. 111-148. Section 1557 of the Affordable Care Act prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities. 42 U.S.C. § 18116. Section 1557's implementing regulations, 45 C.F.R. §§ 92.1 – 92.203, effective as of July 18, 2016, and affirmed as of June 12, 2020, apply to health programs or activities administered by recipients of Federal financial assistance from the Department of Health and Human Services (the "Department").

63.     Defendants participate in one or more Medicare and Medicaid healthcare plans with third-party payers and is a participating provider under Medicare and Medicaid. As a result, Defendants are covered entities under Section 1557.

64.     Section 1557 of the Patient Protection and Affordable Care Act prohibits discrimination on the basis of disability in any health program or activity, any part of which receives federal financial assistance, including credits, subsidies, or health insurance contracts. 42 U.S.C. § 18116; 29 U.S.C. § 794. The nondiscrimination standards under Section 1557 are at least as stringent as the standards under Section 504 of the Rehabilitation Act. 45 C.F.R. § 92.3.

65.     The implementing regulations of Section 1557 prohibit discrimination of an individual on the basis of disability, *inter alia*, and prohibit an individual from being excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination under any health program or activity. *See* 45 C.F.R. §§ 92.2(a); 92.103; and 92.105.

66.     Where the regulatory provisions use the term "public entity," the term "covered entity" shall apply in its place. As applied to Section 1557 covered entities, the Title II regulations require them to "make reasonable modifications to its policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability . . . For the purposes of this section, the term "reasonable modifications" shall be interpreted in a manner consistent with the term as set forth in the regulation promulgated under Title II of the Americans with Disabilities Act, at 28 CFR 35.130(b)(7)." *See* 45 C.F.R. § 92.105.

67.     Discrimination includes failure by a covered entity to take appropriate steps to ensure communications with participants with disabilities are as effective as communications with participants without disabilities, including the failure to furnish appropriate auxiliary aids and

services when necessary to afford an equal opportunity to participate in the services and activities of the entity. 45 C.F.R. § 92.202; 28 C.F.R. § 35.160.

68.     Under 28 CFR § 35.160(b)(2), the type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give "primary consideration" to the requests of individuals with disabilities. *Id.*

69.     The Appendix to the ADA regulations also makes clear the public entity has a duty to ensure effective communications and establishes a required deference that must normally be given to a disabled person's personal choice of aid and service:  "the public entity shall honor the choice [of the individual with a disability] unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164. Deference to the request of the individual with a disability is desirable because of the range of disabilities, the variety of auxiliary aids and services, and different circumstances requiring effective communication."  *Id*. pt. 35, App. A (alteration in original) (quoting 28 C.F.R. pt. 35, App. A (2009)).

70.     As codified at 45 C.F.R., § 92.202, the "effective communication" provision of the Affordable Care Act states:

Effective communication for individuals with disabilities.

(a)     A covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health

programs and activities, in accordance with the standards found at 28 CFR § 35.160 through § 35.164.

71.     In turn, 28 C.F.R. § 35.164, "Duties", states, in pertinent part:  "[t]he decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens.

72.     Accordingly, to the extent that Defendants denied Plaintiff's choice of accommodation, Defendants' leadership was under a legal duty to contemporaneously document in writing the reasons why granting the request would "fundamentally alter the service, program or activity or would result in undue financial and administration burdens."

73.     Section 1557's implementing regulations provide that the enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act, *inter alia*, shall be available for purposes of Section 1557 as implemented by this part." *See* 45 C.F.R. § 92.5.

74.     Defendants' conduct constituted violations of Section 1557.

75.     Defendants' conduct constitutes ongoing and continued violations of Section 1557. Unless restrained from doing so, Defendants will continue to violate Section 1557. This conduct, unless enjoined, will inflict injuries on Plaintiff.

76.    Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act.

77.    As a direct and proximate result of the foregoing, Plaintiff suffered the loss of a civil right for which she suffered great mental anguish that she will continue to suffer for a long time in the future; and Plaintiff was otherwise injured and damaged.

78.    Pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a., Plaintiff is entitled to injunctive relief, as well as reasonable attorneys' fees and costs, and to compensatory damages as provided by statute.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNRUH CIVIL RIGHTS ACT

### [CA CIVIL CODE SECTION 51 ET SEQ.]

79.    Plaintiff restates each and every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if more fully set forth herein.

80.    The UCRA, California Civil Code section 51 provides that:

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b).

81.    Defendants are business establishments within the meaning of the UCRA. Defendants are the owners and operators of business establishments within the meaning of the UCRA.

82.     Defendants violated the UCRA by its acts and omissions, as set forth herein. Specifically, Defendants' service are business establishments within the meaning of Civil Code § 51, *et seq*. Defendants' services are an accommodation, advantage, facility, privilege, and service provided by Defendants, which are inaccessible to deaf patrons. This inaccessibility denies deaf consumers full and equal access to the accommodations, advantages, facilities, privileges, and services that Defendants make available to the non-disabled public, in violation of the UCRA, California Civil Code § 51, *et seq*. These violations are ongoing.

83.     Defendants' actions constitute intentional discrimination on the basis of a disability in violation of California Civil Code § 51, *et seq*. Defendants are required to provide ASL interpreters and VRI software, among other reasonable accommodations.

84.     Defendants are additionally violating California Civil Code § 51, in that the conduct alleged herein constitutes a violation of various provisions of the ADA, 42 U.S.C. §§ 12101, *et seq*., as set forth above. California Civil Code § 51(f) provides that a violation of the right of any individual under the ADA shall also constitute a violation of the UCRA.

85.     As a result of Defendants' wrongful conduct, Plaintiff is entitled to statutory damages under California Civil Code § 54.3 for each offense and attorney's fees.

## **FIFTH CAUSE OF ACTION**

### **VIOLATION OF THE DISABLED PERSONS ACT**

### **[CA CIVIL CODE SECTIONS 54-54.3.]**

86.     Plaintiff restates each and every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if more fully set forth herein.

87.     California Civil Code §§ 54-54.3 guarantee full and equal access for people with disabilities to all accommodations, advantages, facilities, and privileges of "all places of public accommodation" and "other places to which the general public is invited." Defendants' facilities constitute "places of public accommodation" or "other places where the public is invited" within the meaning of California Civil Code §§ 54-54.3.

88.     Defendants' facilities constitute accommodations, advantages, facilities, and privileges provided by Defendants to members of the public in California and are, therefore, subject to the access requirements of California Civil Code § 54.1 applicable to "all places of public accommodation" and "other places to which the general public is invited."

89.     Defendants are violating the rights of deaf and hearing-impaired persons to full and equal access to public places by denying Plaintiff and others similarly situated with effective means of communication in their medical facilities in violation of California Civil Code §§ 54-54.3.

90.     Defendants are also violating California Civil Code §§ 54-54.3, in that their actions are a violation of the ADA. Any violation of the ADA is also a violation of California Civil Code § 54.1.

91.     As a result of Defendants' wrongful conduct, Plaintiff is entitled to statutory damages under California Civil Code § 54.3 for each offense.

## <u>PRAYER FOR DECLARATORY JUDGMENT,</u>
## <u>PROSPECTIVE INJUNCTIVE RELIEF, AND DAMAGES</u>

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.      Accepting jurisdiction of this case and declaring the Defendants' policies, procedures, and services are discriminatory and violate the ADA, the ACA, the Rehabilitation Act, the UCRA, and the DPA;

B.      Injunctive relief as set forth below:

a.   An injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals, or their companions, meaningful access to and full and equal enjoyment of Defendants' facilities, services or programs;

b. An injunction ordering Defendants:

i. to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Plaintiff or other deaf or hard of hearing individuals by failing to provide effective communication;

ii. to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

iii. to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

iv. to develop, implement, promulgate, and comply with a policy to ensure, in the event the Defendants utilize a fully functional Video Remote Interpreting System ("VRI"), that such system has a high-speed Internet connection; a video screen with appropriate size, position, capture angle, focus, and proximity to the deaf individual; and appropriate audio quality. When possible, the equipment should be portable and made available to the patient where the patient is located, preferably in a private room to minimize distractions and maintain confidentiality;

v.   to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances, recognizing that the VRI is not appropriate in all medical situations;

vi.   to create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

vii.   to train all their employees, staffs, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ADA and the Rehabilitation Act;

viii.   to train all their employees, staffs, and other agents on a regular basis about Defendants' policies regarding how to properly use VRI services (including how to set up the VRI system and how to obtain technical assistance in case of system malfunction or failure) and how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals.

ix.   Requiring Defendants to incorporate the training referenced in the above paragraph into its new employee orientation for all future Defendants' employees who will have contact with Defendants' patients

x.   Requiring Defendants to notify Plaintiff and her counsel if any individual brings any lawsuit, complaint, charge, or grievance alleging that it failed to provide any aid or service to an individual with a disability at the Defendants' facilities. Such notification must be provided in writing within thirty (30) days of the day when either entity

has received notice of the allegation and will include, at a minimum, the nature of the allegation and any documentation possessed by Defendants or any of its agents or representatives relevant to the allegation;

xi.   Requiring Defendants to issue to Plaintiff and her counsel an annual report within twelve (12) months of the date of an injunction demonstrating compliance with the terms of this Court's injunction and continuing to be provided on an annual basis for a period of five (5) years. The reports should include updated employee policies, procedures, and training records to establish that Defendants have complied with this Court's injunction;

xii.   Allowing Plaintiff, her counsel, and her experts to conduct one site inspection per year for a period of five (5) years of Defendants' medical facilities at issue upon forty-eight (48) hours written notice by Plaintiff to the facility.

C.      Awarding statutory damages, for actual damages suffered by Plaintiff, pursuant to Section 52(a) of the UCRA and 54.3(a) of the DPA.

D.      Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205, 28 CFR § 36.505, the UCRA, and the DPA, including costs of monitoring Defendants' compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee

petition may include costs to monitor Defendants' compliance with the permanent injunction.");

*see also Access Now, Inc. v. LAX World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018)

(ECF 11) (same).

      E.      Awarding such other and further relief as the Court deems necessary, just, and

proper; and,

      F.      Retaining jurisdiction of this case until the Defendants have fully complied with

the orders of this Court.

Dated: July 8, 2022                Respectfully Submitted,

                        */s/ Jonathan D. Miller*
                        Jonathan D. Miller
                        jonathan@nshmlaw.com
                        Alison M. Bernal
                        alison@nshmlaw.com
                        **NYE, STIRLING, HALE & MILLER, LLP**
                        33 W. Mission Street, Suite 201
                        Santa Barbara, CA 93101
                        Phone: (805) 963-2345

                        Benjamin J. Sweet
                        ben@nshmlaw.com
                        **NYE, STIRLING, HALE & MILLER, LLP**
                        1145 Bower Hill Road, Suite 104
                        Pittsburgh, PA 15243
                        Phone: (412) 857-5350

                        *Attorneys for Plaintiff Winter Kelly*

## **DEMAND FOR JURY TRIAL**

Plaintiff Winter Kelly hereby demands a trial by jury of all claims so triable in

the above-referenced matter.

Dated: July 8, 2022                      Respectfully Submitted,

*/s/ Jonathan D. Miller*
Jonathan D. Miller
jonathan@nshmlaw.com
Alison M. Bernal
alison@nshmlaw.com
**NYE, STIRLING, HALE & MILLER, LLP**
33 W. Mission Street, Suite 201
Santa Barbara, CA 93101
Phone: (805) 963-2345

Benjamin J. Sweet
ben@nshmlaw.com
**NYE, STIRLING, HALE & MILLER, LLP**
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Phone: (412) 742-0631

*Attorneys for Plaintiff Winter Kelly*